IN THE UNITED STATES DISTRICT COURT FOR DISTRICT OF COLUMBIA

JILL MARCIN                                    :
                                               :
        Plaintiff,                             :
                                               :
v.                                             : Civil Action No: 13-1308 (ABJ)
                                               :
RELIANCE STANDARD LIFE                         :
INSURANCE COMPANY                              :
                                               :
and                                            :
                                               :
THE MITRE CORPORATION LONG TERM                :
DISABILITY INSURANCE PROGRAM,                  :
                                               :
        Defendants.                            :

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

Plaintiff, Jill Marcin, by and through counsel, hereby opposes Defendants' Motion for

Summary Judgment in this action, and sets forth the following grounds:

**FACTS**

ADMINISTRATIVE HISTORY

This matter is based on a wrongful denial of disability benefits to the Plaintiff, Jill

Marcin, by Reliance Standard Insurance Company under an ERISA-based Plan.  The matter was

originally filed in this Court (Civil Action No: 10-1816)  which resulted in the subsequent issued

decision,  *Marcin v. Reliance Standard Ins. Co.*, 895 F.Supp.2d 105, 122 (2012).  This decision

ordered a remand due to ambiguity in the Defendants' denial letters to clarify the claimed

Elimination Period of 11/2/07 and to consider whether Ms. Marcin was partially or residually

disabled.  At oral argument, this Court ordered Ms. Marcin to produce evidence supporting

1

eligibility for long term disability by the onset date.  To this end, Ms. Marcin has produced

voluminous evidence demonstrating her entitlement to benefits in addition to withheld evidence

which changes the onset date to be employed.

Following remand, Reliance failed to issue a claim decision after 90 days and only did so

after prompting by this counsel.   The new claim denial dated 1/7/13 (M2 248 - 52) cited the plan

provisions for "Total," "Partial," and "Residual Disability" but failed to provide th explanations

concerning partial and residual disability ordered by this Court.  At the same time, this Court

requested that Ms. Marcin provide evidence of disability at the onset date.

The 1/7/13 denial letter set a new disability date of **11/6/07** (M2 **250)** offering no

explanation as to how this date was calculated while also proffering a newly obtained vocational

review undertaken on 11/1/12.

This counsel filed a timely administrative appeal on 6/28/13 (Letter at M2 1290 - 1377)

which included additional medical, functional capacity, and vocational evidence supporting the

disability claim and, in particular, evidence supporting disability on the offset date.

The Defendants refused to consider the appeal (Letter dated 7/24/13 at M4502) with Ms.

Marcin refiling the instant lawsuit based on the deemed denial.  This Court has ruled that the

additional file submitted is to be considered as part of the new lawsuit.  Ms. Marcin has provided

that evidence as part of the Marcin 2 (M2) record, which is numbered in the same order as sent

with the 6/28/13 appeal, followed by the evidence submitted to this Court as part of the prior

proceeding, as well as a responsive vocational report provided after the original 6/28/13

submission.  **Each and every document submitted with the Marcin 2 record submitted to**

**this Court was before the Defendants during the administrative review periods.**  Their late

objections are baseless.

WORK RECORD EVIDENCE

This Court made findings concerning the Ms. Marcin's inability to work based upon an incomplete work history supplied by the Defendants in the original claim file (See Defendants' Incomplete Work Record set forth in Exhibit 1).

Based on the work hours submitted by Defendants, this Court found that Ms. Marcin originally stopped work on 8/20/07 and returned to work as of 11/07.  During this period,  she was still within the policy "Elimination Period."  The Elimination Period means: the greater of expiration: 180 consecutive days of Total Disability or **the end of the Mitre Corporations continuation program** (M2 33)(emphasis added).

The Defendants found that  Ms. Marcin worked 170 hours between 11/12/07 - 12/23/07 and, in accordance with the "Interruption Period" provision of the plan (M2 35), setting her new date of disability at **12/15/07** (First claim denial dated 6/11/08 at M2 208 and Second claim denial dated 9/29/09 at M2 237[1]).  Therefore, the correct Elimination Period would be completed 90 days later on **3/13/08**.[2]  During this entire period, the Claimant was receiving salary continuation pursuant to the Mitre Salary Continuation Plan as acknowledged by the Defendants (M2 208), yet they did not account for the accrued leave utilized by Ms. Marcin (as detailed below as in Exhibit 1). Subsequently, Ms. Marcin stopped working completely as of 2/18/08.

These findings are incorrect.  This counsel requested and obtained additional leave information from Mitre Corporation (M2 211 - 5 and also set forth on Exhibit 1 as Corrected

---

[1]In particular, the 9/29/09 denial failed to list the leave taken by Ms. Marcin.

[2]Please note 29 days in February as 2008 was a "Leap" year.

3

Leave).  As it turns out, the Defendants failed to provide and/or address the complete information

concerning the number of credited work hours which include sick, sick bank, and holiday leave.[3]

These additional factors change Ms. Marcin's credited working hours substantially.

A normal work week under the Plan is defined as 32 hours.  Ms. Marcin's credited work

hours for Mitre Corporation reveal that she satisfied the 32 hour work week requirement from

**10/1/07 through 4/27/08** under the Mitre Salary Continuation Plan.  Therefore, Ms. Marcin's

Elimination Period should be reset to **4/27/08 and not the 12/15/07** date as originally and

improperly determined by the Defendants who failed consider the properly credited leave hours.

Further, this also undermines the newly proffered disability date of **11/6/07** advanced in the more

second, more recent claim denial letter dated 1/7/13 (M2 250) as Ms. Marcin was clearly

working on that date and as well as months later as set forth in the Corrected Leave (Exhibit 1).

No matter what, Ms. Marcin was  "actively at work" as she was receiving salary

continuation pursuant to the Mitre Salary Continuation Plan verified by her salary of $90,000 on

7/26/11(M2 2112), increasing to $96,000.00 on 5/24/11 (M2 2111) as she was still considered to

be "working."

As the Elimination date runs 180 days, Ms. Marcin is required to prove her continuing

disability from **4/27/08 - 9/27/08.**  The Defendants refuse to acknowledge these clear facts in

their Brief.  This corrective information undermines a great deal of the factual basis for this

Court's original decision as well as the Defendants' new grounds for denial of this claim.

*Reliance Never Considered if Ms. Marcin Was Partially or Residually Disabled.*

Although this Court directed Reliance to consider whether Ms. Marcin was partially

---

[3]See M2 262 - 3, 285 for the incomplete work record

disabled, the insurer never undertook that analysis.  Ms. Marcin  initially stopped working on

8/20/07.  She attempted to return to work on 11/6/07, but never completed a full week's work

from 10/1/07 - 4/27/08 for the 32 hour or 40 hour work weeks scheduled.  The majority of these

weeks, Ms. Marcin  performed no work whatsoever.  In reviewing the pertinent policy definition,

Ms. Marcin was required to be disabled for a period in which she satisfies a 180 day Elimination

Period during which she did not work for a minimum of 160 hours as part so as to be entitled to

Partial Disability coverage.  From her return to work from 11/6/07 to the period of 11/26 - 12/2

(dated of 11/31/08 selected as interim date), Ms. Marcin satisfied the definition of partial

disability.  Thereafter, she satisfies the definition of Total Disability as of 12/1/08.

OTHER PERTINENT PLAN PROVISIONS

> **PHYSICAL EXAMINATION AND AUTOPSY:** We will, at our
> expense, have the right to have a Claimant interviewed or examined:
> (1) physically;
> (2) psychologically; and/or
> (3) psychiatrically
> to determine the existence of any Total Disability which is the basis for a
> claim.  This right may be used as often as it is reasonably required while a
> claim is pending. (M2 40)

> The **Elimination Period** means: the greater of expiration: 180 consecutive
> days of Total Disability or the end of the Mitre Corporations continuation
> program. (M2 33)

> "Eligible Classes" include all full-time and part-time employees. (M2 33)

> "Actively at Work" and "Active Work" mean actually performing on a
> Full-time or Part-time basis the material duties pertaining to his/her job in
> the place where and the manner in which the job is normally performed.
> This includes **approved time off** such as vacation, jury duty, and funereal
> leave, but does not include time as a result of an Injury or Sickness.
> (emphasis added)(M2 35)

> "Sickness" means illness or disease **causing Total Disability** which

begins while insurance coverage is in effect for the Insured. Sickness includes pregnancy, childbirth, miscarriage, or abortion, or any complication therefrom. (emphasis added)(M2 35)

"Interruption Period" means, if, during the Elimination Period, an Insured returns to work for less than 160 hours, then the same or related Total Disability will be treated as continuous. Hours that the Insured is working during this interruption period will not count towards the Elimination Period....(M2 35).

MEDICAL EVIDENCE SUPPORTING DISABILITY

 Ms. Marcin was first hospitalized for portal vein thrombosis on 11/3/05 (M2 2231 - 3, 2297 -2300) and underwent surgery for renal cell carcinoma (partial right nephrectomy) on 8/29/07 (M2 2235 - 71) with following excision of a 1.8cm tumor (M2 324 - 6)undertaken by transplant surgeons, Drs. Guilherme Costa and Kareem M. Abu-Elmagd.  The cancer diagnosed was confirmed by biopsy on 8/29/07 (M2 381 - 4, 390 - 2) and genetic testing (M2 319 - 24).

Ms. Marcin was diagnosed with Factor V Leiden mutation on 12/21/05 (M2 2271 - 4) which causes a hypercoagulable state.

Splenomegaly was first detected on. 11/3/05 (M2 2301 - 2).

Repeat endoscopies have repeatedly revealed varices caused by portal hypertensive gastrophy/duodenopathy. on 1/2/07 (M2 341), 2/2/10 (M2 901 - 2)(grade I esophageal varices with extensive gastrophy with hemorrhage), worsening to grade II by 2/15/11 (M21839 - 41) and to grade III by 9/20/11 (M2 1482 - 4),  9/9/11 (M2 1789 - 93)( revealing bleeding varices and severe portal hypertension), 2/19/13 (M2 1824 - 6) and 3/26/13 (M21832 - 3)(large esophageal varices).

CT scans have repeatedly confirmed Ms. Marcin's conditions on 3/15/07 (M2 411 - 2) (along with splenomegaly and an enlarged right renal mass), 6/22/07 (AR 315 - 6),  8/22/07 (M2

6

418 - 9)(thrombosed portal vein, cavernous transformation, splenomegaly and numerous varices), 3/6/08 (M2 352 - 3), 3/9/08 (M2 2285 - 7), 6/30/08 (AR 572 - 3), and 2/3/10 (M2 1190) (all revealing continuing portal and splenic venous thrombosis, multiple lesions and varice, and splenomegaly).

Ms. Marcin underwent a sleep study on 6/17/08 (AR 568 - 71) which revealed delayed onset sleep.

Ms. Marcin was hospitalized with non-epileptic seizures from 10/6/08 - 10/8/08 (AR474 - 89). The hospital notes record slowed movement, fatigue, interruptions in cognitive status, and sleep disturbance.

Treating oncologist Anthony Felice diagnosed Ms. Marcin with portal vein hypertension with thrombosis, status post shunt procedure, renal carcinoma, and pancytopenia secondary to splenomegaly on 2/29/07 (M2 398 - 9), 3/14/07 (M2 403 - 4), 3/19/07 (M2 405 - 6), 4/14/07 (M2 400 - 2). Dr. Felice noted Ms. Marcin's history for Factor V Leiden mutation on 10/26/07 (M2 327 - 8) and 11/30/07 (M2 407 - 8). Chronic anemia, cytopenias, and portal and mesenteric vein thromboses were reported on 12/31/07 (M2 409 - 10). Dr. Felice continued these diagnoses on 2/29/08 (M2 2221 - 2) and 7/28/08 (M2 2215 - 7) and noted fatigue along with syncope. Persistent, excessive fatigue was again noted on 4/14/08 and that Ms. Marcin "appears chronically ill" (M2 2218 - 20).

Dr. Felice diagnosed Ms. Marcin with portal hypertension with thrombosis (CT confirmed on 2/14/11 (M2 1425 - 7), splenomegaly, pancytopenia, and Factor V Leiden on 4/6/11 (M2 1401 - 2). He noted chronic fatigue and abdominal pain. (Reports dated 4/6/11 at M2 1401 - 2, 3/2/01 at M2 1022 - 3, 12/6/10 at M2 1407 - 8, 9/27/10 at M2 1409 - 10, 8/25/10 at M2

1411 - 2).  On 9/5/12 (M2 2145 - 51) , Dr. Felice again noted Ms. Marcin's many continuing

illnesses with chronic fatigue. On 4/29/13 (M2 2143 - 4), Dr. Felice reported continuing

diagnoses of portal hypertension, splenomegaly, pancytopenia, and hypercoagulable states.

after Ms. Marcin has received 5 doses of IV Venofer during a hospitalization due to clogging of

her shunt.

On 5/12/08 (M2 562 - 3) , Ms. Marcin's treating hematologist/transplant doctor, Kareem

M.Abu-Elmagd (C.V. at M2 601 - 63)[4] noted that Ms. Marcin was suffering from diarrhea three

times a week and low grade fevers. He reported symptoms of fatigue and lethargy on 3/20/08

(M2 305 - 6).  Sudden muscle weakness was noted on 5/22/08 (M2 558 - 9).

Ms. Marcin was hospitalized at the University of Pittsburgh Medical Center (UPMC)

from 10/6/08 - 10/9/08 (M2 2181 - 96) due to severe fatigue to the extent of being unable to

move or talk, and urinating in bed.

Pancytopenia was confirmed during by bone scan and blood test on 7/10/09 (M2 893 -

900, 901 - 12).

Ms. Marcin was diagnosed with non-epileptic seizures in the University of Pittsburgh

Medical Center from 10/6/08 - 10/9/09 (AR 746 - 61).  Ms. Marcin's fatigue was noted in

addition to slowed movement and interruptions in her cognitive status along with sleep

disturbance (delayed sleep onset as revealed by sleep testing on 6/17/08 at AR (AR 746 - 61)).

Ms. Marcin was again admitted for emergency care at Reston Hospital Center for an

upper gastrointestinal bleed as a result of her conditions from 9/6/11 - 9/10/11 (Summaries at M2

---

[4]Dr. Abu-Elmagd's accomplishments demonstrate his well-earned position as a renown
authority on portal hypertension.

1731 - 2, 1755 - 8).

Arteriograms on 9/29/11 (M2 1829 - 30) revealed occlusion of the extrahepatic portal vein with enlarged coronary vein and extensive gastric and esophageal varices.

Dr. Abu-Elmagd operated on Ms. Marcin to repair her bleeding varices on 11/8/11 (M2 1827 - 8).

Dr. Costa noted continued diagnoses of portal vein hypertension, pancytopenia, history of early stage renal cell carcinoma and factor V Leiden on 12/30/11 (M2 1845 - 51) and 2/21/13 (1481 - 5).

A venogram of Ms. Marcin's shunt on 2/21/13 (M2 1870 - 3) revealed moderate focal narrowing which required emergency treatment including a balloon angiography to reopen.

Arteriovenous scan on 4/23/13 revealed continued splenomegaly (M2 1868 - 9).

Ms. Marcin takes many potent medications including neupogen,  levaquin, warfarin, phenazopyridine, nitrofurant, lunesta, hydrocodone, avelox (M2 2005 - 15).  Side effects of medications include dizziness, fainting, fever, confusion, headache, weakness, lightheadedness, among others (Taken from www.drugs.com  at M2 912 - 5, 2016 - 64, 2152 - 80).

Photos (Exhibit 2) reveal Ms. Marcin's extensive surgery.

MEDICAL LITERATURE EVIDENCE SUPPORTING DISABILITY

*Portal Vein Hypertension* (Summary at M2 1301 - 2with referenced literature at M2 2437 - 2678)

Ms. Marcin suffers from portal vein thrombosis (PVT) which is the total or near total obstruction of blood flow resulting from invasion of primary or secondary tumors of the liver and thrombosis of the portal vein.  PVT is a rare condition, affecting between 0.05 - 01% of the population.   It is responsible for 5 - 10% of all cases of portal hypertension.

9

Common symptoms of PVT include abdominal pain, thrombocytopenia, transient or permanent ascites, anorexia, fatigue, splenomegaly, anemia, and weight loss.

The ten year survival rate for persons with PVT is 38 - 60% with most deaths occurring due to secondary disease (e.g., cirrhosis, malignancy).  A one year mortality rate has been estimated at 8 - 10% for persons with PVT only and up to 26% for persons with PVT and cancer.

*Pancytopenia*  (Summary at 1308  - 9 with referenced literature at M2 2867 - 2896)

Pancytopenia is a serious blood disorder in which there is a reduction of all types of peripheral red blood cells which involves a combination of anemia, neutropenia, and thrombocytopenia.  It presents with symptoms of bone marrow failure such a pallor, dyspnea, bleeding, bruising, and increased propensity for infections.  Pancytopenia is diagnosed through a detailed relevant history including treatment history, history of drug intake, and radiation exposure.  Meticulous examination is required and is followed by basic blood investigations with bone marrow examination undertaken thereafter, if warranted.  Panycytopenia is managed in several ways including reversal of the underlying cause and adequate supportive care (including transfusion, medication, and  prevention of infection) until normal blood counts are restored.

*Functional Capacity Evaluation* (Summary at M2 491 - 6 with referenced literature at M2 715 - 886)

A functional capacity evaluation is the assessment of physical, physiological, and functional measure to determine performance potential for activities of daily living and work tasks.  An FCE determines an injured worker's ability to return to work by matching the physical abilities of the worker with physical demands of work tasks.  FCE testing includes dynamic work tests (lifting, carrying, bending, reaching, climbing) which result in information about the

overall ability of the worker.  This testing includes projecting work into an eight hour day and compares physical demands of a job as part of the outcome of functional capacity evaluation.

Physical therapists using standardized observations can make reliable determinations of work ability with many measures demonstrating reliable measures of work performance.

There is no single most appropriate functional capacity test for all clients with the best option being for the professional evaluator to select a test that reflects the need and abilities of the client, the workplace environment, and the demands of the job.

*Need for Physical Examination* (Summary at M2 1309 - 14 with referenced literature at M2 2897 - 2995)

The history is the single most important facet of every patient encounter.  It documents an injury or quantitates the effects on a person's lifestyle or capabilities. A physician often assumes the role of a detective in a standard medical examination.  In the impairment evaluation, a sound and skillful physical examination is a necessary component of the standard medical examination and the impairment evaluation.   The physical examination, like the history, is utilized to obtain evidence to support or refute a diagnosis, document abnormalities, and quantitate pathologic changes.  A comprehensive examination does more than assess the body systems.  It is a source of fundamental and personalized knowledge about the patient.

History and examination are inseparable.  The examination begins the moment the physician first meets the patient.  Observations made during the interview reveal more about the patient than may be revealed during the formal examination.

In formulating an opinion as to what activities a patient can and can no longer do, a clinical estimate similar to activity prescription for rehabilitation is required.  This estimate is a

prescription whose aim is to define baseline function and maximize physical outcomes within the limits of reason and safety.

FUNCTIONAL CAPACITY EVIDENCE SUPPORTING DISABILITY

Dr. Abu-Elmagd took Ms. Marcin off work on 3/20/08 until further notice (AR 870).  Her recovery remained unknown as of 8/25/08 (M2 281).

Treating oncologist/hematologist, Anthony J. Felice, in his report dated 4/14/08 (M2 400 - 2) and 2/29/08 (M2 398 - 9) noted persistent fatigue which has prevented her from working.

Ms. Marcin underwent a neuropsychological evaluation under the supervision of Carolyn Nöel, Psy.D. on 1/26/09 (Report at AR 432 - 41, C.V. at 442 - 6) which revealed:

- Frequently required repetition of instruction on multi-step tasks
- Needed brief breaks during testing with decreasing energy as testing progressed
- Significant differences between verbal and nonverbal abilities
- Difficulty tracking and monitoring her performance in verbal fluency exhibiting a 10th percentile score on one test and revealing mild executive dysfunction overall
- Reduced fine motor control and dexterity
- Impaired ability to concentrate
- Significant deterioration in ability to hold and manipulate auditory information with increasing task speed
- Executive function dysfunction in several areas of testing (auditory and visual sustained attention, response inhibition, speed of processing for complex information, and organizational and self-monitoring abilities)  which are clinically significant in light of Ms. Marcin's superior intellectual functioning resulting in difficulty organizing information in a well that is well-encoded and easily retrieved
- Overall test results reveal impaired executive functioning abilities which are negatively impacting Ms. Marcin's performance in several areas of cognitive functioning

The Claimant underwent a neuropsychological evaluation conducted by David A. Shostak (Report at M2 2080 - 93, C.V. at 2094 - 6).  This evaluation included a comparison of the findings made by the previous evaluation by Carloyn Noel, Ph.D.  Following this testing, Dr. Shostak found:

- Increased difficulty on tasks that were more directly sensitive to executive deficits
- Attention was severely impaired for both auditory and visual information (1%)
- Verbal fluency in the borderline range (10%)
- Mental flexibility of 16% with significant decay in ability to maintain and transform verbally presented information as tasks demands increased
- Dr. Shostak noted parallels between his current and Dr. Noel's previous testing
  - By only slightly altering the cuing on testing, Dr. Shostak demonstrated that Dr. Noel's observation that Ms. Marcin had difficulty tracking an self-monitoring her performance, scoring only a 16th percentile with significant decay as task demands increased
  - Dr. Noel also felt that Ms. Marcin suffered from deficits in cognition, but used only a single test.  Multiple tests by Dr. Shostak revealed a dramatic decrease in ability
  - Difficulty with information processing demands  when presented with several sources of incoming information and shifting of attention sets
- Ms. Marcin is "truly neuro-cognitively disabled" whose impairments are "truly work disabling"
- She struggles with basic activities of daily living
- She has recurring amnesia lapses

Ms. Marcin underwent a functional capacities evaluation under the supervision of Carlos

A. Martinez, P.T., on 10/24/08 (Report at M2 2065 - 71, C.V. at M2 2078 - 80) which revealed

the following:

- Testing into full range of sedentary and partially into light work, both of which were unsustainable
- Deficits including sustaining activities for more than short periods of time
- Below part-time workplace tolerance (below 4 hours per day)
- No symptom magnification
- Workplace tolerance currently below part-time tolerance with Ms. Marcin unable to participate in repetitive sustainable activities with work subject to interruption
- Ms. Marcin's  report of taking a 4.5 hour nap following testing in spite of having 8 hours sleep

A repeat functional capacity evaluation was undertaken on 6/2/11 (M2 2071 - 7) which revealed only nominal improvement with no capacity to return to work.

The Medical and Functional Capacity Assessment completed by Janice E. Ragland, MD (M2 963 - 70 with C.V. at M2 971)  dated 5/10/10 states:

- Confirmation of Ms.Marcins's diagnoses and chronic fatigue

13

- Symptoms including abdominal pain/distension, fatigue, thrombocytopenia, splenomegaly, and malaise
- Experiences pain colitis attacks once per month (16 - 20 minutes)
- Needs to be in close proximity to bathroom on a regular and daily basis
- Can stand/walk/sit 30 - 60 minutes at one time
- Cannot alternate sitting and standing throughout a work day
- Can sit/stand/walk a total of 3 hours per day
- Cannot lift 10lbs or more
- Only intermittent crouching, crawling, climbing, and stooping
- Only occasional handling/fingering/pinching
- Requires three or more hours of rest during daytime hours (with at least one two hour period) during which she would need to lie down
- Loss of productivity of 36% or more
- Inability to maintain necessary time at work station or work attendance
- Concurrence with FCE findings

Treating oncologic surgeon Kareem Abu-Elmagd in his answers to the Medical and

Functional Capacity Assessment dated 5/10/10 (M2 972 - 87) based on his **entire course of**

**treatment of Ms. Marcin** states:

- Confirmation of Ms. Marcin's many conditions and noting her chronic fatigue
- Ability to walk/stand/sit for less than 30 minutes on a continuous basis
- Ability to lift 10lbs. on an intermittent basis (a few times, but not consistently)
- Intermittent crouching, balancing, stooping
- Fatigue requiring three or more hours in an eight hour work period in 2 one and a half hour periods
- Reduction in productivity of 36% or more
- Inability to maintain necessary time at work station or work attendance.
- Concurrence with FCE findings
- Severe risk of future blood clots
- Possible future complications of liver failure, organ transplant, major bleeding event and cancer recurrence
- Sitting for only 31 - 60 minutes until moderate to severe risk of blood clot formation
- Stress exacerbates all of her symptoms
- Subject to many workplace conditions as hazards due to her health conditions

Treating transplant surgeon, Guilherme Costa completed a Medical and Functional

Capacity Assessment dated 5/7/13 (M2 2100 - 7) **based on his entire course of treatment** and a

14

second such assessment on 5/23/13 (M2 2108 - 9) based on Ms. Marcin's entire course of

treatment and made the following findings:

- He is a transplant and vascular surgeon
- He work alongside Dr. Kareem Abu-Elmagd until Dr. Elmagd departed the work facility on 7/31/12
- Diagnoses include hypercoagulable state, portal vein thrombosis, Factor V Leiden deficiency, splenomegaly, gastric esophageal varices, portal hypertensive gastropathy, neutropenia, thrombocytopenia, decreased liver volume, history of renal cancer, and chronic fatigue
- Symptoms including abdominal pain/distension, fatigue, thrombocytopenia, fever, splenomegaly, irritability, malaise
- Standing/walking/sitting for 30 - 60 minutes continuously without ability to alternate between sitting and standing due to risk of clotting
- Total sitting of only 3 hours over the course of an eight hour day
- Walking limited to 1 - 2 blocks due to fatigue with rest of over one hour until able to perform the same
- Need to elevate leg to hip height due to fatigue and risk of blood clot
- Lifting up to 15lbs on an intermittent basis only (able to do a few times, but not consistently)
- Only intermittent climbing, crouching, crawling and stooping
- Additional activity results in incapacitating fatigue due to decreased liver function
- She is at very high risk for clotting and bleeding
- Pain, fatigue, and medication side effects result in needing three or more hours of rest on a daily basis in two 1.5 hour rest periods during which she would need to lie down or recline **and** results in a reduction of productivity of 36% or more (in terms of deficits in sustaining concentration, attention, focus, persistence and pace).
- Unable to sustain workplace attendance or work station presence
- Concurrence with FCE dated10/24/08 and noting both continuing concurrence with findings as well as presence of same restrictions from 8/20/07 forward

Dr. Elmagd reviewed Dr. Costa's finding and expressed his concurrence on 6/11/13 (M2

2110) and noted the need for a new FCE following the initial 10/24/08 evaluation.

Dr. Felice noted no improvement in Ms. Marcin's condition on 6/20/13 (M2 2135 - 42).

VOCATIONAL EVIDENCE SUPPORTING DISABILITY

Ms. Marcin in her benefits application dated 8/25/08 (M2 277) listed the following job

duties for her position as a Senior Multi-Discipline Systems Engineer: travel throughout United

States (bicoastal travel), advising employees concerning large scale programs, standing in for

Chief Systems Engineer for one program, coordinating efforts with up to 60 persons daily,

working without lunch or any other type of break, among others.

Ms. Marcin's Mitre job description for Multi-Systems Engineer (M2 58 - 9) includes:

- Knowledge of the following systems: information management, automatic control, communications, sensor, signal and information processing, transportation, command and control, intelligence and reconnaissance, weapons, and surveillance
- Knowledge of multi-dimensional tradeoff analyses across multiple disciplines
- Understands conceptual and actual design of engineering solutions
- Skill in creating solutions of information system integration and operability
- Design assessment, plan development, and feasibility determinations

Supplemental Job Requirements for Ms. Marcin's position as a Multi-Discipline engineer

were provided with her appeal as well and  included:

**Working Hours:** 8:30AM - 6:30PM, Monday – Friday unless on travel when extended hours required

**Travel Requirements**: Travel throughout the continental United States with trips taken six times each year on average as well as extensive local travel (requiring extended driving)

**Job Duties:**
- Analyzes various technical systems including imaging, sensor, and image processing
- Perform a complete breakdown of all the advantages and disadvantages of each possible solution
- Make recommendations and cost estimates for proposed solutions
- Attend multiple technical exchange meetings to gather information for each project
- Attend programmer reviews to evaluate the potential of programs and their value for future projects
- Utilization of multiple computer programs to assemble information and compute ultimate recommendations and cost variables
- Contract revision and negotiation for various government projects
- Monthly reporting to supervisory personnel

16

**Physical Requirements**:

**In Office**:

- Sitting approximately 50% of workday with 50% walking/standing due to expansive offices requiring  walking to separate floors and/or buildings to discuss aspects of ongoing work
- Lift/Carry up to 10lbs. on an occasional basis (as defined in the *Dictionary of Occupational Titles* (Revised, 1992)
- Arm and hand use frequent (from 1/3 to 2/3 of workday as defined in *DOT*) for reaching, keyboarding, pinching, writing, and manipulation
- Postural changes (bending, stooping, crawling) on an occasional basis

**On Travel:**

- Sitting 90% of time and standing/walking 10% of time.  Several travel locations requiring a mile or more of walking to arrive at destination due to secure nature of work
- Lift/Carry up to 30lbs. on an occasional basis (as defined in the *Dictionary of Occupational Titles* (Revised, 1992)
- Arm and hand use on an occasional basis (as defined in *DOT*) for reaching, keyboarding, pinching, writing, and manipulation
- Postural changes (bending, stooping, crawling) on an occasional basis

**Mental Requirements:**

- Ability to undertake multiple tasks at one time
- Ability to sustain concentration, attention, focus, persistence and pace throughout the entirety of an extended workday
- Working with exacting standards of care
- Dealing with difficult people under stressful circumstances
- Ability to remember, retain, and recollect thousands of pieces of information without resorting to use of reference
- Ability to maintain calm and professional demeanor even while engaged in difficult circumstances
- Ability to coordinate work efforts with other team members

These job requirements have been confirmed by Ms. Marcin (AR 882 - 4) and former

co-worker, Technical Lead, Charles G. Fink (AR 613 - 15).  The employer did not provide any

physical or mental job requirements (M2 255).

The vocational review dated 7/9/13 (M2 4490 - 7) by Kathleen Sampeck, MA, CRC, CRP, CLCP (C.V. at M2 4498 - 501) reviewed the entirety of the medical and vocational records int his case, interviewed Ms. Marcin, and found:

- Her fatigue is unpredictable and severe such that she is unable to perform simple activities of daily living
- Cannot engage in work activity on a repetitive, reliable, and sustained basis
- Experiences difficulties with concentration, memory, information processing and hand tremors
- Experiences sleep disturbance with difficulty falling asleep and waking up
- Confirmed the physical and mental demands of Ms. Marcin's prior work
- She receives iron IVs 2 - 4 times a week and sees many specialists several times a year for her treatment
- She is incapable of performing her past work or returning to any employment on a regular and sustained basis with over-exertion placing her at grave risk
- The First Rehabilitation Resources, Inc. report failed to include an interview with Ms. Marcin, ignored the objective FCE evidence and treating provider opinions, stated jobs with physical requirements in excess of her performance and cognitive abilities, did not consider her significant absenteeism

## STATEMENTS SUPPORTING DISABILITY

Ms. Marcin provided the following statement in 12/08 (M2 22393 - 401), stating

- She has put off writing such a letter in hope of an eventual recovery and return to work
- Her fatigue and chronic illness have had a "devastating" effect on her life
- She has worked since she was 12 years old and worked her way through college with various jobs including babysitting, restaurant hostess, inventory clerk, bindery operator, billing department clerk, teaching assistant, line cook, among others
- She is too proud to let herself be seen by others except her husband who sees her on days when she is so fatigue that she does not shower
- Her prior work was intense and stressful with a lot of local/domestic travel
- She could not complete the tasks required of her position and would call in sick due to fatigue and constant illness
- Even with reduced workload, she could not perform the required duties with another employee performing this work in only 25% of her time
- She had to pre-plan rest periods throughout her wedding day in July, 2008, eventually becoming completely exhausted an hour into her reception to the point she could hardly walk and could not participate in the traditional bridal dance and

her husband carrying her from the final dance to the hotel room where she collapsed and slept

- Her fatigue is unpredictable and has become a part of her daily life
- Prior to ceasing work, she had won a year research grant along with a colleague
- She had been accepted to Johns Hopkins University to study for a Masters degree in biomedical engineering

Ms. Marcin provided a second statement on 6/16/13 (M2 2049 - 50) stated:

- She was becoming very successful as a multisystems engineer with Mitre Corporation with her employer offering to pay for her masters degree before she fell ill
- She was well liked by my employer, supervisor and fellow employees who bent over backwards when she became ill so as to allow me to keep working
- She struggled to work from November, 2007 to mid-February, 2008 while I was ill and she kept falling behind on the many work issues as she felt lethargic and unproductive. But, she continued to struggle to do anything for as long as she could as she did not want to give up my work life.
- Her daily symptoms include acute drowsiness and lethargy. She spends most of my day sleeping which is interrupted by frequent bathroom trips due to gastrointestinal distress
- She suffers from poor memory and confusion with now having to write myself notes for simple activities which I would never have forgotten in the past.
- She has trouble even performing routine activities (eating, showering, etc.) in her own home.
- She has been told my doctors on two occasions that I would probably die during surgery, if I made it surgery to all. Calling her conditions "disabling" is an understatement, as she now calls herself a "professional patient." Even when she feels somewhat healthier, she needs to see her doctors constantly (at least once per week for some routine test at minimum).
- Her previous provider, Dr. Elmagd left for a new job at the Cleveland Clinic and she has continued my care with his associate Dr. Costa who assisted Dr. Elmagd while he was caring for me in Pittsburgh.
- On the occasions she needs go to Pittsburgh for treatment, her father or husband drive me to these appointments as she is far too fatigued to do so. On only a couple occasions when she had to drive herself for lack of other assistance, she would have to stop about three times each way for at least a half hour to rest so as to be able to tolerate the trip.
- She receive gross amounts of assistance from her husband who does the bulk of the shopping, cooking, laundry, cleaning, yardwork, etc.
- She used to paint as a hobby, but can no longer do this due to fatigue and tremors
- Quoted as "Never in my life did I think I would end up this way. This was not in the plan. It is my living Hell and there is no enjoyment in it. I miss being

19

productive and performing a meaningful job that had become a very promising career. I could only wish that my insurer would take the time to visit or examine me so as to see how awful my situation has become."

Ms. Marcin's cousin, David Moll, wrote (M2 2326) that following her second surgery, she is not able to play softball, baseball, billiards, swim or play board games as she did before. Ms. Marcin now needs to rest, even doing so at her own wedding and did not come to the after party at the hotel.

Ms. Marcin's aunt, Brenda Moll, on 12/11/08 (M2 2327 - 8) noted that Ms. Marcin:

- No longer goes trick or treating
- Is unable to play games with her children
- Has no energy with falling asleep on couch with blanket

Ms. Marcin's husband, Patrick Garrett wrote (M2 2329 - 30) stated:

- She does not have enough energy to participate in going hiking, kayaking, skiing, bike riding, attending concerts, or visiting museums
- She has not had enough energy to shower
- No longer able to take spontaneous trips
- Medications have reduced some of her symptoms, but have addressed the causes
- She suffers from feelings of shame and remorse due to her inability to work which is against her working class childhood training

Ms. Marcin's other aunt, Patricia Eisner, wrote on 12/12/08 (M2 2331) that her niece is not able to function beyond the most basic activities of daily living. She cannot complete activities such as laundry, meal preparation, and routine home cleaning.

Ms. Marcin's mother, Marion Marcin, in her letter dated 12/12/08 (M2 2020 - 23) wrote the following about her daughter:

- She has witnessed her daughter's battles with life-threatening illness and related medical ordeals
- Her daughter has always been a self-motivated, independent, aggressive individual in both her professional and social life
- Following her spleno-renal shunt operation, she made the best recovery given her

20

tedious medication and dietary regimen including side effects
- Her daughter's immune system has been compromised and she suffers from complex coagulation issues
- Her daughter must adhere to a strict cleanliness routine or be subject to infection
- Following her second kidney surgery, her daughter has suffered from severe fatigue, becoming exhausted from any normal daily activities
- Her daughter struggles with basic household chores
- Her daughter's many physician appointments and monitoring sessions occupy a great deal of her time
- Her daughter's shunt can shut down at any time and must be aggressively treated for varices to prevent bursting
- Her lifestyle has been "catastrophically" changed due to her illness

Ms. Marcin's godmother, Donna J. Beadle, wrote on 12/16/08 (AR 970) that her

goddaughter has little enthusiasm for activities like crafts, painting or hiking as she once did

often.  Ms. Marcin has to excuse herself from family gatherings due to tiredness.  Her husband

and parents assist her greatly in ordinary housekeeping and self care tasks.

Ms. Marcin's sister-in-law, Alison M. Marcin, wrote on 12/14/08 (M2 2406):

- Claimant was an active, healthy, successful young woman who took many trips and engaged in many activities
- Claimant despite uncertainty of her fate has faced her surgeries with courage and determination
- Claimant has drastically changed her diet and cannot enjoy things her peers do
- It was sad to see her unable to attend her own wedding day
- She cannot even lift light boxes with only fleeting moments when she has energy

Her father, Thomas Marcin in his letter dated 12/14/08 (M2 2025 - 7) wrote that his

daughter:

- Following an initial survival and recovery from a first surgery that she had to face a second kidney cancer surgery involving cutting about her entire torso
- She became too tired to even work three part-time days a week
- Her energy has remained very low and she is not able to do daily activities for more than 15 minutes without taking a nap
- Even during a home move, she fell asleep on the way to her new house and could not provide guidance as to directions
- She is not capable to typical day-to-day activities and does not have the strength to have a job

21

- It is difficult as her father to write about her condition as he has been able to do little to help her

Ms. Marcin's brother, Thomas M. Marcin, wrote on 12/14/08 (M2 2028) that his formerly "vigorous and energetic" sister is not longer able to participate in even the most undemanding activities for any length of time.  Each task she performs exhausts her.  She does not engage in many family activities or leisure activities.  Despite her strong desire to recover, it has not happened, leaving her unable to work.

OTHER APPROVED DISABILITY BENEFITS

Defendants were sent Ms. Marcin's fully favorable decision from the Social Security Administration dated 5/28/10 (M2 989 - 95) in which Administrative Law Judge R. Neely Owen found that the Claimant was disabled and unable to perform any work due to her many medical conditions.

Where an administrator encourages a beneficiary to apply for Social Security Disability benefits and directly benefits from the award of those benefits, the claim administrator's failure to consider the agency's finding of disability may bear on the propriety of its decision to deny or terminate benefits. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S.105, 118 (2008); *See Also*, *Elliot v. Sarah Lee Corp.*, 110 F. Supp.2d 458, 468 (W.D.Va. 2000).

STANDARD OF REVIEW

The origin of the applicable standard of review was set forth in *Firestone Tire & Rubber Co. v. Bruch*, 489. U.S. 101 (1989) in which the Supreme Court plainly stated:

> if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "factor in determining whether there is an abuse of discretion."  *Id*. at 115 quoting Restatement (Second) of Trusts § 187 (1959).

This decision went on to specifically state that even the most careful and sensitive fiduciary in those circumstances may unconsciously favor its profit interest over the interests of the plan, leaving beneficiaries less protected than when the trustee acts without self-interest and solely for the benefit of the plan. *Id*.

It has been held in *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2351 (2008) that:

> Benefit decisions arise in too many contexts, concern too many circumstances, and can relate to many different ways to conflicts...which themselves vary in kind and in degree of seriousness... for us to come up with a one-size-fits-all procedural system that is likely to promote fair and accurate review."

The *Glenn* decision went on to state that a company that evaluates claims for benefits and pays benefit claims suffers from a conflict of interest. *Id*. at 2348. In such situations, an insurer should show evidence that it took "active steps to reduce potential bias." *Id*. At 2351. The conflict of interest is generated by three factors. First, the evaluator-payor is usually chosen and paid by the employer. Second, to reduce premium costs, the employer may choose an insurer based on its ability to keep costs down. Third, marketplace standards do not serve as a substitute for the special standard of care placed upon administrators in conducting a "full and fair review" as required under ERISA. *Id*. at 2349 – 50. The conflict of interest is to be weighed as one of several factors when determining the lawfulness of the benefits denial. *Id*. at 2351.

A claims determination must be determined to be reasonable in light of the apparent conflict. *Buford v. Unum Life Ins. Co. of Am.*, 290 F. Supp.2d 92 at 98 (D.D.C. 2003) citing *Sampson v. Citibank*, 53 F.Supp.2d 13 (D.D.C. 1999); *Block v. Pitney Bowes, Inc.*, 952 F.2d 1450 (D.C. Cir. 1992). More specifically, the rendered decision must be "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." *Id*. at 99

citing *Fitts v. Federal Nat'l. Mort. Assoc.*, 77 F.Supp.2d 9, 19 (D.D.C. 1999), *rev'd on other grounds*, 236 F.3d 1 (D.C. Cir. 2001) quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997).  Substantial evidence means "more than a scintilla but less than a preponderance." *Id*. at 100.  The Court is empowered to consider whether the claims decision "strayed outside the bounds of reasonableness to become an abuse of discretion. *Id*. citing *Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co.*, 230 F.3d, 415, 419 (1st Cir. 2000).

Overall, an insurer acting under a conflict of interest is required to conduct a good faith, reasonable investigation into the validity of the beneficiary's claim.  *Hamilton v. AIG Life Ins. Co.*, 182 F.Supp.2d 39, 46 (D.D.C. 2002) citing *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1148; *Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1568 (11th Cir. 1990).

Plan administrators under a conflict results in the conflict being weighed as a factor in determining whether there has been an abuse of discretion.  *Hamilton*, *supra*, at 182, citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), Restatement (Second) of Trusts § 187, Comment d (1959).  Administrators of insurance plans are considered fiduciaries under ERISA and must act in the best interests of their policyholders.

Insurance companies that pay benefits out of their own pockets have an incentive to deny policyholder's claims, thus creating a potential conflict of interest. *Id.* At. 43 -4 citing *Fitts v. Federal Nat'l. Mort. Assoc.*, 77 F.Supp.2d 9, 20(D.D.C. 1999), *rev'd on other grounds*, 236 F.3d 1 (D.C. Cir. 2001).  For this reason, a sliding scale approach is utilized in which the level of deference show to the insurance company decreases in proportion to the evidence of a conflict.  *Id*. at 444 citing *Pinto v. Reliance Std. Life Ins. Co.*, 214 F.3d 377, 392 (3d Cir. 2000).

ARGUMENT

*Summary Judgment is Appropriate in this Case.*

A motion for summary judgment should be granted when it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law."  Fed.R.Civ.P.56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying [which materials]...it believes demonstrates the absence of a genuine material fact." *Celotex Corp.*, 477 U.S. at 323.  A fact is "material" only if the fact "might affect the outcome of the suit under the governing law...."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute regarding a material fact is "genuine...if the evidence is such that reasonable jury could return a verdict for the nomoving party."  *Id*.

*Defendants Undertook a Selective Review of the Evidence*

There was voluminous medical evidence submitted with the administrative appeal dated 6/28/13 (Medical summary at M2 1294 - 6 with documents at M2 1404 - 2300). **The Defendants refused this material.**  This documentation includes leave information which address the Defendants' disability onset dates of 11/2/07 and 11/6/07**.**  These documents include opinions from Drs. Costa and Abu-Elmagd, Ms. Marcin's treating specialists from the outset, who and confirm her functional restrictions throughout her entire period of treatment which prior to her kidney cancer surgery on **8/29/07** (See Functional Capacity Section, p.14 - 16 above).  Further, the Defendants refused to review the neuropsychological findings of David A. Shostak, Ph.D. (Above at p.13 - 14) which clarified the findings of neuropsychologist, Carolyn Noel, and further support Ms. Marcin's disability.  Similarly, the Defendants have ignored the functional capacity

findings of record made by persons actually examining Ms. Marcin, all of which support her disability.  Lastly, the Defendants failed to address the vocational reporting submitted.

An administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).  Moreover, an administrator may not emphasize a certain medical report that favors a denial of benefits while de-emphasizing another report that suggests a contrary conclusion.  *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct., 2343, 2350, 171 L.Ed.2d 209 (2008).  Similarly, a plan administrator may not disregard evidence supporting a claimant's disability. *Donovan v. Eaton Corp.*, 462 F.3d 321 (4th Cir. 2006); *Williamson v. A.T. Massey Coal Co., Inc.*, 56 F.Supp.2d 656, 660 (S.D.W.Va. 1998).
*Defendants Failed to Consider the Combination of Ms. Marcin's Many Medical Conditions.*

At no time did the Defendants consider the entirety of Ms. Marcin's medical conditions. To consider medical conditions while ignoring the effect of others is a denial of a full and fair review under ERISA.  *Duperry v. Life Ins. Co. of N. Am.*, 2011 WL 199087 at *10 (4th Cir. 1/24/11);  *Guthrie v. National Rural Elec. Coop. Assn. Long Term Disability Plan*, 2007 U.S.App.LEXIS 28563 (4th Cir. 12/11/07).  A refusal to consider co-morbid impairments and consider how disparate impairments might impact with one another and affect claimant's employability is arbitrary and capricious.  *Laser v. Provident Life & Accid. Insur. Co.*, 211 F. Supp. 2d 645, 655 (D.Md. 2002);  *Lawrence v. Motorola. Inc.* , 2006 U.S. Dist. LEXIS 63730 (D.Ariz. 8/24/06);  *Buzzard v. Holland*, 2004 U.S.App. LEXIS 8170 (4th Cir. 5/17/04); *Austin v. Continental Cas. Co.*, 216 F.Supp.2d 550, 558 (W.D.N.C. 2002); *Willis v. Baxter Int'l*. 175 F.Supp.2d 819 (W.D. N.C. 2001);  *Abram v. Cargill, Inc.*, 395 F.3d 882 (8th Cir. 2005);

26

*Dirnberger v. Unum Life Ins. Co. of Am.*, 246 F.Supp.2d 927, 935 (W.D.Tenn. 2002).

The medical records of evidence clearly establish Ms. Marcin's disability for all onset dates listed herein.  As part of a "full and fair review," the ERISA regulations require that a review "takes into account all comments, documents, records and other information submitted by the claimant..."  29 C.F.R. §2560.503-(h)(2)(iv). The Defendants failure to consider these records is a clear failure to provide the "full and fair" review required.

*The Defendants Utilized a Conflicted Medical Reviewer* (Summary at M2 1333 - 8, Documents at M2 3726 - 844)

University Disability Consortium (UDC)  has a history for its work with the disability insurance industry.  An audit on UDC performed by The Hartford concerning cases referred to UDC in the year 2005 revealed that Dr. Stuart Shipko was paid $17,055 in fees for only February - March, 2005 with his performing 126 reviews for UDC from 2001 - 5.

UDC derives 75% of its revenue from work done The Hartford for which it gives volume discounts.  *Finley v. Hartford Life & Acc. Ins. Co.*, 2007 U.S.Dist.LEXIS 91950 at *4(N.D.Cal. 12/14/07); *Caplan v. CNA Financial*, 544 F. Supp.2d 984, 989 (N.D.Ca. 2008)(Holding that such conduct constitutes a conflict of due to UDC's financial reliance on the Hartford which encourages it to provide reviews to The Hartford's liking in order to garner repeat business.).

UDC marketing materials state that one of their main benefits is reduced insurer costs. UDC offers comprehensive panel evaluations of two or more physicians which it touts to be an "effective means to avoid the problem of specialists arriving at different and sometimes contradictory conclusions."

*Medical Reviews Are Subject to Bias*

Ms. Marcin's appeals set forth extensive medical literature and media reporting which details the biased nature of medical review work (Full Summary at M2 1314 - 22, Documents at M2 3147 - 93). Many physicians are hired by insurance companies to provide medical reviews as a supplement to the their declining treatment or to supplement retirement income. Many of these physicians have received no specialized training for this purpose. Due to insurer influence, these reviews are generally neither objective nor of superior quality. Although called "independent," the examiners are dependent on their corporate clients for their livelihood. The insurance carriers utilize such reviews as they are dependable aids to cost cutting.

Medical reviewers are different from a treating physician and are not obligated to have the patient as a primary interest. However, their opinion and testimony should be held to the same scientific and ethical standards. The monies earned from medico-legal work are far greater than the reimbursement received for office-based patient care and virtually all non-interventional treatments. The linkage of expert testimony with current and financial gain is an inherent and powerful conflict of interest which has significant potential to bias. Given the benefits of a medical-legal practice, it is no wonder that experts want to be hired again. It is obvious that an IME or expert witness offers too many opinions that are not in the interest of the contracting party, that physician might not be hired again.

The *New York Times* article on 4/1/09 titled "Exams of Injured Workers Fuel Mutual Mistrust" detailed the poor conduct of "independent" medical examiners in the New York Workers Compensation system which consistently found against claimants no matter how injured they were. As the interviewed examining physician stated:

If you did a truly pure report, you'd be out on your ears and the insurers wouldn't pay for it. You want to give them what they want, or you're in Florida.  That's the game, baby."

A review of cases found a routine tilt toward the benefit insurers by minimizing or dismissing injuries. As stated by Dr. Stephen M. Levin, Co-Director of the Occupational and Environmental Medicine Unit of Mount Sinai Medical Center:  "There are some noble things you can do in medicine.  This ain't one of them."

*The Defendants Utilized Biased Reviewers*

The Defendants hired Drs. Stuart Shipko and Herbert Dean who were previously utilized through University Disability Consortium (UDC) on 96 other matters. (M2 997-8)

Stuart Shipko (Summary at M2 1338 - 40, with documents at M2 3484- 4454).

The insurer hired Stuart Shipko, MD to review this claim.  Dr. Shipko operates a website called "Power Surge" in which he provides advice to inquiring persons. Due to this practice, Dr. Shipko was been reported to "Ripoff Report" in which he was called a "quack" and causing a person to be hospitalized.  Dr. Shipko defended himself by stating that the person never came to his office for treatment.  His responses to the those seeking advice share a common theme, that the inquiring person should seek treatment.  Each piece of advice rendered is followed by the following bold-faced disclaimer:

> **Information provided by Dr. Shipko is general in nature and should not be construed as a substitute for a visit to and examined by your own personal physician.**

Dr. Shipko is overtutilized by the insurance industry for the purpose of procuring biased claim reviews.  *See, Kelly v. Unum Life Ins. Co. of America*, 2009 WL 996051 at *3 (D.Ariz. 4/14/09); *Forrest v. Hartford Life and Accident Ins. Co.*, 2007 WL 2507744 (W.D.Mo. 8/30/07);

*Hert v. Prudential Ins. Co. of America*, 2009 U.S.Dist.LEXIS 35779 (M.D.Fla. 4/28/09); *Price v. Disability RMS*, 2008 WL 763255 at *16(D.Mass. 3/21/08)(similarly ignoring a treating physician's opinion.

Dr. Shipko was deposed in *Floreani v. Unum Life Ins. Co. of Am.*, Case No. 10-02054 in the United States District Court for the Eastern District of California on 3/30/11 during which he made the following statements:

- He does not have regular office hours and sees patients for about 15 hours a week
- He does not have a secretary
- He hold the position of "Consultant" with Unum
- He does not perform any tests with his reviews
- He is unfamiliar with any ethical standards for forensic reviews (P61, L7 - 14)
- He has not taken a continuing medical education course in performing a disability examination in 10 - 15 years
- He believes that examination of a claimant will not provide him greater information about the disagreement between the treating and reviewing doctors
- He contacts collateral sources to obtain information about patients in his private practice (P85, L14 - 25)

Dr. Shipko's C.V. (M2 584 - 90) indicates the majority of his work since 2003 has been medical review work for Unum, UDC, Connecticut General Life Insurance Co., and other entities.  Dr. Shipko was paid $1,855.00 for performing the review in this case (M2 600).

Dr. Shipko's review dated 5/12/09 (M2 578 - 3) fails to set forth any review of the raw data from the neuropsychological data or any interview with Ms. Marcin. Rather, Dr. Shipko tries to minimize Dr. Nöel's findings from her actual testing of Ms. Marcin instead of conducting his own interview and testing as ethically required.  He does not address Dr. Shostak's findings, rendering his findings substantially incomplete.

It has been held that the testimony of a nonexamining psychiatrist was of little probative value and was only speculative. *Campbell v. U.S.*, 307 F.2d 597, 598 (D.D.Cir. 1962).

30

Moreover, the value of a psychiatrist's testimony depends largely on his opportunities for observation and the facts he observes. *Rollerson v. U.S.*. 343 F.2d 269, 270 (D.C.Dir. 1964); *Jones v. U.S.*, 327 F.2d 867, 879 - 80 (D.D.Cir. 1963).

Multiple Reviewer Support

Further, Dr. Shipko's "telephonic discussion" with Dr. Dean fails to buttress their adverse findings in any way as the law is quite clear concerning the use of multiple medical reviewers. No credibility has been given to multiple  reviewers who indicated that additional information would be helpful in evaluating a claim, then set forth findings to deny a claim. *Evans v. Eaton Corp. Long Term Disability Plan*, 2006 WL 2997153 (D.S.C. 10/18/06).  Where multiple medical reviewers set forth flawed reviews (whether based on a selective or incomplete review of the evidence), a denial of benefits is arbitrary and capricious. *Kreeger v. Life Ins. Co. of N. Am.*, 2011 WL 710588 (C.D.Cal. 2/28/11).

It is improper to rely on multiple medical reviews when the insurer had the authority to conduct a physical examination and failed to acquire one. *Williams v. Hartford Life & Accid. Ins. Co.*, 2009 U.S.Dist.LEXIS 94857 (S.D.Ohio 9/25/09). Similarly, two paper reviews denying disability do not overcome unanimous opinions from treating physicians treating a claimant over a period of years. *Gharagozloo v. Aetna Life Ins. Co.*, 2009 WL 3753589 (S.D.Fla. 11/5/09).

It is also an abuse of discretion to order multiple paper medical reviews including surveillance footage to acquire opinions that a claimant was not disabled. *Finley v. Hartford Life & Accid. Ins. Co.*, 2009 WL 3517648 (N.D.Cal. 10/26/09).

This case differs little.  The reviews were only undertaken after Ms. Marcin's appeal of her claim denial.  Buttressing one paid non-examining reviewer with another similarly hired to

provide uninformed, biased opinions fails to substantiate any basis for denying Ms. Marcin's claim.

<u>Herbert Dean</u> (Summary at 1338 , Documents at M2 591 -600, 3844 - 64)

Dr. Dean's C.V.(M2 596 - 99) reveals that he has been doing nothing but medical reviews since 2001,  working for both UDC and Unum.  He is currently 75 years old and is employed at Unum Corporations (M2 3478).  His review dated 5/12/09 (M2 591 - 5) fails to review a majority of the medical records, nor does it take into account the combined effects of Ms. Marcins' many medical conditions.  It ignores all of the functional capacity findings, and sets forth unsupported abilities indicating "light" work , specifically stating that Ms. Marcin is able to stand/walk for up to 3 hours, lift 20lbs. occasionally and 10lbs. frequently, and drive over 200 miles (based only upon his assumption that she drove herself to exams).  More importantly, this review does not address a great deal of the medical evidence of record.  Dr. Dean was paid $1,855.00 for performing the review in this case (M2 600).

Dr. Dean works as a Medical Director at Unum.  He has not treated any patients since 2001.  His work was criticized in *Keil v. Life Insurance Co. of N. Am.*, 2008 WL 2478327 (E.D. Mich. 6/17/18) for his reliance on videosurveillance rather than medical reporting.

*Defendants Undertook an Inadequate Vocational Review.*

The claim denial letter dated 6/11/08 (AR 161) stated that Ms. Marcin's job was "light" in nature.   The was reiterated by the Defendants' vocational reviewer, Katie M. Hulsey, on 11/1/12 (M2 704 - 7). Light work requires 20lbs. lifting occasionally (up to 1/3 of workday) and 10lbs. lifting frequently (1/3 to 2/3 of workday), walking/standing on a frequent basis, and working at a production rate requiring constant pushing and/or pulling of materials.

32

In this case, the hired vocational reviewer, First Rehabilitation Resources, in its website www.1strehab.com touts its "results-driven" case management for its defense-oriented customers consisting mostly of insurance companies, third party administrators, municipalities, self-insured corporations, law firms, and case management networks. (M2 2118 - 22).

There is no proof other than the findings of a nonexamining reviewer for support that Ms. Marcin can perform at this exertional capacity.  Further, the insurer has failed to make any inquiries so as to perform a proper labor market survey so as to prove that Ms. Marcin  was able to perform any other similar employment.  The vocational reviewer could not even take the time to interview the employee on which her review was based.  This is evidenced by the use of the *Dictionary of Occupational Titles* descriptors of Project Manager, Project Engineer, and Computer Systems Hardware Analyst (M2 2123 - 25) by the reviewer. These positions have not been updated since 1991 and all  fail to accurately describe Ms. Marcin's work as a Multi-Systems Engineer (M2 58 - 9).

It is improper to rely on *DOT* to mischaracterize an insured's occupation.  *Robinson v. Aetna Life Insur. Co.*, 443 F.3d 389 (5th Cir. 2006); *Ebert v. Reliance Standard Life Ins. Co.*, 171 F. Supp.2d 726 )(S.D.Ohio 2001); *Shahpazian v. Reliance Standard Life Ins Co.*, 2005 U.S.Dist.LEXIS 21462 (N.D.Ga. September 27, 2005); *Wirries v. Reliance Standard Life Ins. Co.*, 2005 U.S.Dist. LEXIS 22152 (D.Idaho September 1, 2005); *Freling v. Reliance Standard Life Ins. Co.*, 315 F.Supp.2d 1277 (S.D.Fla. February 24, 2004); *Shipp v. Provident Life & Accid. Ins. Co.*, 214 F.Supp.2d 1241 (M.D. Ala. 2002).

It is clear that Ms. Marcin's job requirements do not comport with the generic job descriptions offered by the non-interviewing vocational reviewers.  Reliance on such is clearly an

33

abuse of discretion.

Given the gross deficiencies in the vocational review undertaken, it is clear that the findings are arbitrary and capricious.

Whereas, the vocational report prepared by Kathleen Sampeck,  MA, CRC, CRP, CLCP, dated 7/9/13 (M2 4490 - 7) included a complete review of the medical, functional capacity, and vocational records and an interview with Ms. Marcin.  There is no question that this report is much more thorough in both its scope and substance.

*The Insurer Undertook an Unethical Psychologic Review.* (Summary at AR125 - 6, Documents at M2 3475 - 3613)

The Principles of Medical Ethics from the American Psychiatric Association. Section 7(3) states that it is unethical for a psychiatrist to offer a professional opinion about a specific individual unless he has conducted an examination.  This position has been confirmed in the *Psychiatric News* which discusses the increasing use of psychiatric reviewing in disability cases.

The same ethical consideration is required under the Specialty Guidelines for Forensic Psychologists (Section IV, H).

This position is reinforced in the treatise *Principles and Practice of Forensic Psychiatry*, 2nd ed. (Arnold 2003) by Rosner, R., ed.,  Chapter 8, pp. 56 - 72, on Ethical Guidelines by Robert Weinstock, Gregory B. Leong and J. Arturo Silva states that one of the problem areas is "the power of the adversarial legal system to both seduce and abuse psychiatrists in ways that demean the profession."  This chapter refers to an ethics survey of forensic psychiatrists which revealed that the "hired gun" problem was considered to be the greatest ethical problem.  This section states that psychiatrists should "gather the maximum amount of relevant data to most accurately

34

present the subjective truth as they see it."  If the examiner cannot conduct a personal examination after a reasonable effort, any conclusions rendered must include a statement that no personal examination was conducted and that the opinions expressed "are thereby limited."  If this is not done, the opinion is considered "unethical."

The improper nature of psychologic reviewing without performing an examination has been held in disfavor by many courts.  The testimony of a nonexamining psychiatrist was of little probative value and was only speculative.  *Campbell v. U.S.*, 307 F.2d 597, 598 (D.D.Cir. 1962); *See Also*, *Jones v. U.S.*, 327 F.2d 867, 879 - 80 (D.D.Cir. 1963)(limited observation of subject was insufficient), *Campbell v. United States*, 307 F.2d 597, 598 (D.D.Cir. 1962); *Rollerson v. United States*, 343 F.2d 269, 270 (D.C.Cir. 1964)("We think it necessary to point out that the value of a psychiatrist's testimony depends largely upon his opportunities for observations and the facts he observes.").

*The Defendants Never Addressed the Side Effects of Medication.*

Although a complete list of Ms. Marcin's medications and side effects were provided to the Defendants, they never once addressed this issue.

It is arbitrary and capricious not to consider effects of medication  *McKoy v. Int'l Paper Co.,* 488 F.3d 221 (4th Cir. 2007); *McAllister v. Life Ins. Co. of N. Am.,* 2009 WL 1560159 (E.D.Ark. 5/7/09); *Lawrence v. Motorola, Inc.*, 2006 WL 2460921 (D.Ariz. 8/24/06);  *Conrad v. Reliance Standard Life Ins.*, 292 F.Supp. 233, 242 (D.Mass. 2003)*; Godfrey v. South Central Bell*, 89 F.3d 755, 758 - 9 (11th Cir. 1996).  Many medications cause disabling cognitive impairments.  *Sabatino v. Liberty Life Assur. Co.*, 286 F.Supp.2d. 1222, 1231 (N.D.Cal. 2003), *See Also*, *Dirnberger v. Unum*, 346 F.Supp.2d 927, 934 - 5 (W.D.Tenn. 2002); *Stvartak v.*

35

*Eastman Kodak*, 945 F.Supp. 1532 (M.D.Fla. 1996).

Ms. Marcin is taking many strong medications with serious side effects. The failure to consider these documented problems serves as additional evidence that the insurer abused its discretion.

*The Defendants Rely Improperly on Paper Medical Reviews.*

There is considerable legal authority holding paper reviews in disfavor. A paper reviewer forming a medical opinion on reporting and a surveillance video without benefit of examination is insufficient to determine that a claimant is no longer disabled. *Whitley v. Hartford Life & Accid. Ins. Co.*, Fed.Appx. 546 (4th Cir. 2008). Similarly, a paper review by an in-house doctor without benefit of examination is not reliable. *Stup v. Unum Life Ins. Co.*, 390 F.3d 301 (2004).

Using multiple paper reviewers who did not examine the claimant (with only one who spoke to a treating physician) and only relying on selected portions of a claimant's records does not refute the claimant's complaints of pain in light of numerous complaints of pain during treating physician examinations. *Donovan v. Eaton Corp. LTD Plan*, 462 F.3d 321 (4th Cir. 2006); *See Also*, *Schully v. Continental Cas. Co.*, 2009 WL 1951669 (E.D.La. 6/29/09); *Winkler v. Metropolitan Life Ins. Co.*, 2006 WL 2347826 (2nd Cir. 23/1/06).

A consultant hired by a claims administrator concluding that a claimant is able to perform activities of daily living and simple household chores must explain how such abilities make the claimant "capable of working a regular work day on a consistent, day-in and day-out basis." *Thomas v. Alcoa, Inc.*, 2008 WL 4164156 (D.Md. 9/5/08).

Where there is no cited basis for discrediting a claimant's complaints, an administrator cannot simply disregard her symptoms by relying on the opinions of a nonexamining reviewer.

36

*Boyd v. Liberty Life Assur. Co. of Boston*, 362 F.Supp.2d 660 (W.D.N.C. 2005).  The court went on to state:

> once an underlying physical or mental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such a clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.  *Id*. at *20 citing *Willis v. Baxter Int'l, Inc.*, 175 F.Supp.2d 819, 833 (W.D.N.C. 2001)quoting *Hyatt v. Sullivan*, 899 F.2d 329, 336 (4th Cir. 1990)

Many other jurisdictions have taken issue with the use of paper reviewers in ERISA-based disability cases.  A review only of a medical file of a disability claim is an inadequate basis upon which to deny a claim when the credibility of the claimant's complaints is at issue.  *Rohr v. Designed Telecommunications, Inc.*, 2009 WL 891739 (S.D.Ohio 3/30/09) citing *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005)("[W]hile we find that Liberty's reliance on a file review does not, standing alone, require the conclusion that Liberty acted improperly, we find that the failure to conduct a physical examination – especially when the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination"); *Smith v. Cont'l. Cas. Co.*, 450 F.3d 253, 263 - 4 (6th Cir. 2006)(the decision by the administrator not to perform an examination to evaluate complaints of pain and allows a reviewer to make determinations of a claimant's pain complaints was arbitrary and capricious).

It is arbitrary and capricious for a defendant to rely upon physicians it hand-selected and paid rather than the claimant's personal physicians. *Vick v. Metropolitan Life Insur. Co.*, 2006 U.S.Dist.LEXIS 8722 (E.D.Mich. February 21, 2006).  It is similarly arbitrary and capricious to

accept opinions of an in-house internist rather than treating specialist who ignored a treating physician's opinions. *Addis v. The Limited Long-Term Disability Program*, 425 F.Supp.2d 610 (E.D.Pa. 2006).

Similarly, it is unreasonable for an insurer to disregard the opinion of a claimant's treating psychiatrist in favor of an opinion of a one time file reviewer. *Kinser v. Plans Administrator Committee of Citigroup, Inc.*, 2007 WL 988759 (M.D.Ga. March 29, 2007).

It is arbitrary and capricious to rely on the findings of a paper reviewer who asserts that there is not objective data to support activity restrictions despite verifiable objective test results in the claim file. *Pichurski v. Liberty Life Assur. Co. of Boston*, 2007 WL 892368 (E.D. Mich. March 21, 2007).

Reliance on a paper review which did not address the claimant's significant fatigue was improper. *Engel v. Jefferson Pilot Financial Ins. Co.*, 2009 WL 3166513 (W.D.Pa. 9/28/09).

Where an insured's treating physician's opinion in unequivocal and based on a long term patient-physician relationship, reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason for denying benefits. *Kaufmann v. Metropolitan Life Ins. Co.*, 2009 WL 3149613 at *16 (E.D.Pa. 9/24/09). Similarly, two paper reviews denying disability do not overcome unanimous opinions from treating physicians treating a claimant over a period of years. *Gharagozloo v. Aetna Life Ins. Co.*, 2009 WL 3753589 (S.D.Fla. 11/5/09).

It was held in *Blankenship v. Metropolitan Life Ins. Co.*, 686 F.Supp.2d. 1277 (N.D.Ala. 2009) that:

> Most hired hands don't go contrary to the boss's best interest.  Paid

experts, more often than not are, in this court's experience, "predisposed" or "preconditioned."  Courts have consistently expressed their skepticism of benefits administrator's reliance on pure paper medical reviews, and have often held that such reviews are evidence of shallowness and transparency that is the essence of arbitrariness and capriciousness.  Citing *Bennett v. Kemper Nat. Svcs., Inc.*, 514 F.3d 547, 554 - 5 (6th Cir. 2008); *Montour v. Hartford Life & Acc. Ins. Co.*, 2009 WL 3856933, at *10 (9th Cir. 11/19/09).

A paper reviewer's findings are not credible when the reviewer lists all the documents reviewed, but does not specify upon which evidence he bases his decision.  *Bowers v. Hartford Life & Accident Co.*, 2010 WL 1963412 (S.D.Ohio 5/17/10).  Similarly, summary findings without explanation in a paper review are not credible.  *Cox v. Cigna Group Ins.*, 2010 WL 724640 (E.D.Ky. 2/24/10).

An in-house reviewer cannot be considered "independent" under the abuse of discretion standard of review.  *Kreeger v. Life Ins. Co. of N.Am.*, 766 F.Supp. 991 (C.D.Ca. 2011).

The paper reviews undertaken in this case are held in disfavor as a physical examination was available under the plan terms, but was not undertaken by the Defendants.

*Reliance Standard Failed to Follow Its Own Guidelines* (M2 4477 - 88)

Following the claimant interview (C1 . 3), Reliance Standard was responsible for gathering missing information or clearing up any ambiguous information given on the claim form. The claim record reveals that Reliance Standard failed to gather a majority of the medical evidence of record.

This failure is more pronounced when one considers the mandate that Reliance Standard employees request additional information and clarifying information on claims (C1.3 - 4). Reliance made no efforts to gather any clarifying information concerning Ms. Marcin's

functional abilities. Rather, it chose to rely on nonexamining, paper reviewers hired by conflicted medical review companies.  In addition, Reliance Standard failed to acquire the correct leave information for Ms. Marcin in order to identify a correct date of disability onset.

As part of the initial determination of the claim, Reliance Standard was responsible for gathering information including medical records, attending physicians statements, occupational duties, functional capacity evaluation(s), independent medical examinations, and medical record reviews (C1.4).  Reliance failed to gather necessary vocational information, conduct any independent medical examination or functional capacity evaluation, failed to conduct a vocational interview, and had little contact with Ms. Marcin's treatment providers.

Following appeal of a denied claim, Reliance Standard is responsible for reviewing the claim, taking into account all comments, documents, records, and other information, submitted (E4.4 (4)) with no deference to the initial adverse benefits determination shall be afforded upon appeal (E4.4(5)).  On the contrary, Reliance Standard refused to consider Ms. Marcin's second administrative appeal.

All "relevant" information is to be provided to a claimant with "relevant" defined as: any document, record, or other information which:

- Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination;

- A complete job analysis/description

All rehabilitation referrals should include, where applicable and appropriate:

- A complete job analysis/description

- Any Transferable Skills Analyses and/or a labor market surveys (E8.1 - 2)

40

The failure to follow internal guidelines has been held as evidence of conflict of interest for which the heightened scrutiny of the plan administrator's claims denial has been applied. *Doe v. MAMSI Life and Health Ins. Co.*, 471 F.Supp.2d 139, 148 (D.D.C. 2007); *Pulliam v. Continental Cas. Co.*, 2003 WL 1085939 (D.D.C. Jan. 24, 2003) citing *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999); *Hensley v. Northwest Permanent Retirement Plan & Trust*, 5F.Supp.2d 887, 890 - 2 (D.Or. 1998); *See Also*, *Woodward v. Reliance Standard Life Ins. Co.*, 2003 U.S.Dist. LEXIS 19206 (N.D. Fla. March 11, 2003) citing *Cerrito v. Liberty Life Assur. of Boston*, 209 F.R.D. 663, 664 (M.D. Fla. 2002); *Caldwell v. Life Ins. Co. of Am.*, 165 F.R.D. 633 (D.Kan. 1996); *Blau v. Del Monte Corp.*, 748 F.2d 148 (9th Cir. 1985).  In this case, it is patently clear that the Defendants failed to follow their own guidelines.

CONCLUSION

The Defendants have outright ignored the serious nature of Ms. Marcin's diagnosed conditions which are far more than disabling, but will be eventually fatal.  The combination of hypercoagulation of the blood and portal vein hypertension is crippling.  Ms. Marcin's portal vein shunt is subject to shut down due to thrombus clogging at any time which requires emergency angioplasty to correct.  Her portal vein hypertension has never been brought under control with extensive evidence documenting the continuing presence of esophageal and gastric varices.

In addition, Ms. Marcin suffers from the effects of renal cell carcinoma, splenomegaly and pancytopenia.  The combined effects of this constellation of serous illnesses was never considered by the Defendants.

It is very clear that Ms. Marcin remains a very sick woman who is basically clinging to

41

life.  To state that she is not disabled and able to work cannot be done with a straight face and constitutes unfair claims handling.

Rather than conduct a full and fair review of the claim as required under ERISA,, the Defendants denied benefits based on the improper calculation of Ms. Marcin's onset date and on the basis of paper medical reviews by persons with a long history of finding people not disabled hired by a company employed by insurance companies for that very purpose.

To buttress the medical denial, the Defendants have solely relied upon the functional findings of the nonexamining reviewers and have cast aside the many functional capacity findings made by providers who have actually examined Ms. Marcin.  Such conduct is clearly an abuse of discretion.

Rather than review the voluminous evidence submitted with Ms. Marcin's final appeal, the Defendants chose to disregard this evidence **in its entirety.**  Such conduct is clearly the product of arbitrary and capricious claims conduct. In doing so, Reliance Standard ignored its own claims guidelines which require that all the evidence of record be considered during the claims review.

As a result of this misconduct, the Defendants have ignored the findings of two functional capacity tests,  another clarifying round of neuropsychologic testing, a vocational review, and vast witness testimony confirming Ms. Marcin's diminished capability of performing activities of daily.

All in all, the actions of the Defendants can hardly be characterized as that of a "fiduciary" who had a duty to provide a full and fair review in this claim.  Rather, the Defendants made minimal efforts as part of a predetermined course to deny Ms. Marcin's disability claim.

Given the cumulative conduct in this case, it is abundantly clear that Reliance Standard's actions were a result of its inherent conflict of interest as administrator and payor of Ms. Marcin's disability claim.

After the Defendants attempted to sandbag Ms. Marcin by issuing a denial with a different disability onset date and a new vocational report, they refused to review the administrative appeal filed.  Little conduct could be more arbitrary and capricious.

The Defendants have refused to address the majority of the evidence of record in their Summary Judgement Motion.  Instead, they attempt to rehash their arguments as to why the evidence contained in Ms. Marcin's final appeal should not be made part of the record.  This argument has already been made and lost. Thus, the Defendants will undoubtedly raise new arguments in their Reply to address the evidence in this Opposition Memorandum . For this reason, Ms. Marcin reserves the right to file a surreply in response.

WHEREFORE, Ms. Marcin respectfully requests this Court to:

Declare  that she is entitled to all benefits under the policy including payment of all back benefits with interest;.

Payment of all attorney's fees and costs associated with attempting to secure these benefits pursuant to Section 502(g)(1) of ERISA;

Restoration of life insurance with refund of previously paid premiums;

Payment of all required contributions to Ms. Marcin's retirement plan;

Vacate this Court's previous decision in this matter; and

Any such other equitable relief  that the Court may deem just and proper.

Respectfully submitted,

_____/s/_____
Scott B. Elkind, Bar 10810
Elkind & Shea
801 Roeder Rd., Ste. 550
Silver Spring, MD 20910
P: (301) 495-6665
F: (301) 565-5111
Attorney for Plaintiff


Plaintiff requests oral argument concerning all issues raised herein.


_____/s/_____